Mr. Justice Cox
delivered the opinion of the court: -
This was a bill filed by three out of four children of Allison Nailor, deceased, against the other child as principal defendant. The widow and the sons’ wives and daughters’ husbands are also made parties to the suit. The object of the bill is to procure a partition of the real estate of tfye decedent.
The conspicuous feature of the case, around which all the controversy has gathered, is the fact that the title to a large amount of property, which is claimed to have been a part of the estate of the decedent, has found its way into the name-of the defendant, and the bill claims that the several conveyances by which this result was effected, were procured by fraud and false representations and undue influence practiced upon the deceased, at a time when he was incapable of transacting business or making any rational disposition of his estate.
The transactions referred to took place at different times, and naturally divide themselves into groups accordingly. I shall notice, first, the condition of that property which was included in the following conveyances:
On the 29th of October’, 1872, the deceased, Allison Nailor, *98 sr., conveyed lot number 4 in square number 141 to the defendant, Allison Nailor, jr., in fee simple. On the 5th day of the same month,, the deceased leased to Allison Nailor, jr., parts of lots numbered 11, 12 and 13 in square 205, known as the stable property, and other ground adjacent to it.
On the 2d of October, 18*73, the deceased, Allison Nailor, sr., conveyed this land and some additional ground in fee simple to the defendant, Allison Nailor, jr.,
These transactions were so nearly contemporaneous that they may be regarded as one transaction for the purpose of this decision.
In regard to these conveyances and leases, the allegations of the bill are, that at these dates the deceased had been reduced to a condition of mental imbecility, in consequence of long indulgence in gross dissipation, and was incapable of transacting any business; that he was then under the influence of the defendant, and that he and his wife, by a false representation and by undue influence, induced the execution of these deeds; and it is claimed that they were therefore void, and that all the property embraced in those deeds is to be regarded as inherited by the heirs at law of the deceased and should come into the partition.
■ The same question of capacity, although with reference to a date some four years after these transactions, came before this court and afterwards before the Supreme Court of the United States in the case of Nailor vs. Conley, the object of which hill was to set aside certain conveyances made by the deceased for the benefit of Catherine Conley and her children. I may as well advert at this point to the language of the Supreme Court in commenting on the evidence in that case. It says:
“The bill alleged three grounds for setting the deeds aside. The first was that the grantor was ‘ demented and insane ’ and mentally incapable of making the deeds.”
Passing over the second ground, which related to criminal and illegal intercourse, I read as follows:
“ Third, that the deeds had been procured by fraud and *99 the undue influence of the defendant over the grantor. * * * There is a large mass of evidence in the record introduced to prove that from a long course of dissolute and intemperate habits Nailor had become insane and incapable of transacting business. On the other hand, there is, in our judgment, a great preponderance of evidence to show that when he executed the deeds, although in feeble health, he was of sound mind and capable of intelligently executing and making the conveyances. It would serve no useful purpose to discuss the evidence in detail. But there are some striking facts which should be stated.
“ Of the forty-three witnesses for the plaintiffs who testify in regard to the mental capacity of Nailor, thirty-three gave their opinion from having seen him when drunk. Of these thirty-three, eighteen swear that they never saw him sober; three that they never saw him sober but once, and twelve that they seldom saw him when not intoxicated. Six others of the forty-three witnesses speak of him as incompetent to transact business when he had been drinking. Only four witnesses testify that he was incapable of doing business when sober. Three of these are plaintiffs in this case, namely: W. T. Nailor, Matthew Trimble and James W. Clarke. There is but one witness not a plaintiff in the case who testifies that, during the time covered by the transactions set out in the bill, Nailor, if sober, was not mentally capable of making the conveyances which the bill seeks to set aside.
“ The question to be decided is not whether Nailor had the mental capacity to make the conveyance when intoxi- ■ cated, but whether he was competent when sober, and whether he was sober when he executed them. On these questions the evidence does not leave us in doubt. * * * The apparent discrepancy between the witnesses for the plaintiffs and the witnesses for the defendant on the question of Nailor’s mental condition, is, therefore, in a large degree reconciled by the fact that the former gave their opinions of Nailor’s capacity when drunk and the latter when sober.
f‘ In view of all the testimony on this branch of the case, *100 it appears that Nailor for many years before his death had been dissolute and intemperate, and that during the last seven or eight years of his life his health had gradually failed. Much of the time he was more or less inebriated, but he was frequently entirely sober. When drunk he was, like most men, incompetent to transact business. When .sober, he was, down to his last illness, entirely capable of doing the acts which are assailed in this case. He was competent to make deeds, to understand their effect, and to know whether or not their execution would accomplish his wishes. In all conditions he was perverse, wilful, obstinate and defiant of public opinion.”
In that case the evidence was substantially identical with the evidence in this case, except that it related to a period, as I have already mentioned, four years later than the transactions now under consideration. And without entering into details, we think that very much the same classification of testimony and criticism upon the evidence may be applied to the proofs in the present case, with the result that at this time Nailor was fully competent to transact business and to convey property as he pleased when not under the influence of intoxicants. The evidence does not show that at the date of these transactions he was under that disability. On the contrary, it shows that at the commencement of the period covered by them he had, for the time being, at least, suspended his dissipation.
The next question, as the Supreme Court says in the Conley Case, relates to fraud and undue influence used by the defendant. The court says on this point:
“The next and last ground alleged for annulling the deeds is that Nailor was induced to make them by the fraud ■ and undue influence of the defendant. The ground upon which the courts of equity grant relief in such cases is, that one party by improper means and practices has gained an unconscionable advantage over another. The undue influence for which a will or deed will be annulled must be such .that the party making it has no free will, but stands in vinculis”
*101 And'the court cites some cases upon this point. It says :
,£ In Eckert vs. Flowry, 43 Pa., 46, it was said by Strong, J.: £Now, that is undue influence which amounts to constraint, which substitutes the will of another for that of the testator. It may be either through threats or fraud; but however exercised, it must, in order to avoid a will, destroy the free agency of the testator at the time when the instrument is made.’
“The rule upon this subject was thus stated in Davis vs. Calvert, 5 Grill & J., 302: £A testator shall enjoy full liberty and freedom in the making of his will, and possess the power to withstand all contradiction and control. That degree, therefore, of importunity or undue influence which deprives a testator of his free agency, which is such as he is too weak to resist and will render the instrument not his free and unconstrained act, is sufficient to invalidate it. Tested by these rules, the charge that the deeds in question were procured by the fraud and undue influence of the defendant, is without support. * * * There is an absence of proof that the defendant used either threats, strategem, importunity or persuasion to induce Nailor to execute the deeds. In fact, there is no evidence that the defendant even requested him to make them.’ ”
These same remarks may be applied to the present case. There is no direct testimony of any undue influence or any persuasion or any fraud; and the only ground for suspecting it is the alleged undue preference given to the older son, and the fact that at the date of these deeds the testator was in more immediate intercourse with this son than with other, members of the family; that he had been in bad health during the early part of the transactions, and was ✓living at the residence of the defendant; all of which is .totally insufficient to authorize the court to treat the deeds as invalid on the ground of undue influence.
I will further state here that the testimony of the principal witness for the complainant, Washington T. Nailor, is quite pertinent on this question. He says, at page forty-five of the record, which we have before us:
*102 “ I have not said that he was unsound in his- mind, but I have said that he was incompetent to take care of his business. He was not a crazy man, but he was not a man fit to do business; he was a man of sound mind at times. He would take these whims when he felt like it. He would have a bad feeling from one to the other; when he got it he would do anything against the other. When he was transferring this property to Allison, jr., I have no doubt it was not done out of love he bore him; but it was done to keep others out — me and mother and the other heirs. He was a man of violent passions, and he would do violent things, crazy things. When he was not in a passion, he was as sound in mind as any one I ever knew, when he was young.”
The substance of that evidence is to attribute this transaction, not to any defect of mind, but to violent prejudices more than anything else, and it is inconsistent with the theory of undue influence on the part of Allison, jr., at the time the deeds were executed. It was not done from any love for him, but to spite the others; and that is not a case of undue influence.
I will further refer to the explanation which Allison, sr., gave himself of these transactions to Mr. Peter, his counsel. He stated that this son had been in possession of this property, and by his thrift and management had made it of much more value than it was originally, which was one reason ; and the kindness that he experienced at his hands when he was at odds with other members of the family, was another ; all of which is a rational explanation. We think, therefore, that these conveyances must stand as valid.
The next property to be considered is lot 2 in square 254, a lot of ground on E street near the National Theater. The conveyances referred to in respect to that lot are: first, a lease dated June 8, 1842, which was a lease for ninety-nine years, from J. H. Goddard to Grafton Powell, and by him assigned to Allison Nailor, jr., of the west thirty feet of this lot; and the next a fee simple deed from J. H. Goddard to him, of the same property, dated October- 6, 1842, *103 Then on May 16,1861, there was a conveyance from Columbus Alexander to Allison Nailor, jr., in addition, of the east thirty feet, five and a quarter inches, or the east half as we will call it. On January 24, 1877, there was a conveyance from Helen M. Whipple to him covering the entire lot.
The allegations of the bill, in reference to the whole of this lot, are the same. It says that “the said Allison Nailor, sr., paid the purchase money for the said land, claiming and remaining in possession thereof and taking the rents and profits, so that he was, in equity, the owner of said property ; that a trust resulted to him therein, and that at his death the property in equity descended to his heirs. And they are advised and so represent and show that the said Allison Nailor, sr., did not in his lifetime commit or do any acts by which he manifested any intention either of making a gift of said property to the said Allison Nailor, jr., or of making it an advancement to him out of his estate.”
The bill further avers that the father retained possession and received the rents of the property during his lifetime and up to his death, and never delivered the possession to his son or gave any indication of his intention to give it to him.
The answer shows that the two different halves of this lot were differently situated in some respects. The father paid for the conveyance of the western half from Goddard. The defendant says, on information, that he believes a fund of money was accumulated from presents made to him from time to time, and that was applied by him on the purchase! But of this there is no proof and we will consider it out of the case.
We will, however, assume that it is admitted that the father paid the purchase money on this first conveyance from Goddard of the west half of the lot. The answer of defendant denies that the father remained in possession up to the time of his death; on the contrary, he says that he delivered possession to the defendant, who leased the property to John Talty, and Talty went in and made large improvements on it; and that is the fact.
*104 With reference to the east half of the lot, he denies that his father paid any of the purchase money for the deeds from Columbus Alexander or Helen M. Whipple. He says that he paid that out of his own funds, and that statement is conclusive, as it is not contradicted. Then he goes on to allege that his father having given him the west half of the lot and desiring to give him the other half, suggested to him that he should buy the tax title of Columbus Alexander, which he did, and he alleges that he then took posses-' sion and has held it ever since. The purchase from Helen M. Whipple was a tax title covering the whole lot. That was long afterwards, at least sixteen years after the deed from Columbus Alexander, and he paid for that, he says, with his own means.
Now first with regard to the west half. If this had been a transaction between strangers in blood, the' rule of equity would be that a trust would result to the party who advanced the purchase money. But where the father advances money, and has the title taken in the name of his son, the presumption is that it is an advancement to the son out of his estate ; and it is almost impossible to overcome that presumption. It maybe overcome if it be shown that at the time of the transaction the father openly declared his object to be to create a trust for himself. If the son is under age, the mere reception of the profits or rents of the property is not sufficient to rebut the presumption; but that is referred to the natural guardianship of the father over his son; and nothing that the father says or does long after the purchase of the property is admissible or can be used to rebut the presumption that this was an advancement to the son. It appears, in point of fact, that the father, although he collected the rents a long time and after the son became of age, yet finally gave up possession to him and allowed him to lease the property. In regard to that we are of opinion that there is nothing in the case to rebut the presumption - that this was intended as an advancement. The law on this subject generally will be found stated in 1 Lead. Cas. Eq., 1st Am. ed., pp. 268, 280.
*105 We treat this therefore as property belonging to the son, and as an advancement by the father.
In regard to the east half of this property, it appears that the son took an assignment of the tax title. Under certain circumstances he would not have been able to do that if he had been acting in the capacity of agent for his father. The law would not have allowed him to buy his property at a tax sale for his own benefit. But it appears in this case that the father consented to it.
The testimony of Mr. Selden shows that in the trial of an ejectment suit in regard to this property, Allison Nailor, sr., was a witness on the stand, and declared that his son, Allison, jr., had purchased this tax title from Columbus Alexander with his consent; so that the acquisition of this title is free from any objection at all. Further than that, it seems to us that the conduct of the father in this respect was a ratification of this title; at any rate it was a waiver of all objections to it.
Under the law of tax titles as existing in this District, the original owner, may, by acts in pais, waive objections to tax titles acquired on his property. A common example of that was where a surplus over the amount due for taxes had been paid in as a part of the purchase money and the original owner had withdrawn that surplus from the treasury. That was an affirmance of the tax title. And so we regard it that the assent of the father that the son should acquire the tax title for his own use, amounts to a waiver of objections to the title and a ratification of it.
It is true that the father, in a certain sense, assumed control over this property, as we find evidence of other arbitrary acts on the part of the father in regard to the business of the son; but that, in view of all the circumstances, is not incompatible with the idea that he intended to give the title to his son. We are satisfied that that property must be held to be legitimately the property of the defendant.
This partial control over property which was bought with his money as well as the east half, is all compatible with the idea that he intended the property to belong to Allison, jr., *106 after his death, although he may have assumed to exercise a certain control over it during his lifetime. The bill, so far as that is concerned, therefore, will have to be dismissed.
The next property to be considered is that which was bought in at the sales under execution. The deceased seems to have become careless about the condition of his affairs at this time, and to have allowed judgments to be executed, and sales of his property to take place under execution.
On the 11th of May, 1873, the defendant, Allison, jr., had obtained a deed from the marshal for lot 0 in square 227, belonging to his father. On February 4, 1874, he obtained another deed for the east half of lot 9, square 228, for which he paid $800. On the 25th of June, 1877, he obtained a deed from Frederick Douglass, marshal, for part of lot 3, in square 254, and on the same date another deed from the same for part of lot 8 in square 417. He obtained another deed for lot 9 in square 258 on the same date ; and on the 3d of October, 1877, another deed for lot 10 in square 258.
The bill alleges, in regard to these sales, that Allison Nailor, jr., from 1872 down to the time of the death of his father, collected all or nearly all of the rents of his estate, and that, from February, 1873, “ the said Allison Nailor, sr., under the dictation and control of the said defendant, Allison Nailor, jr., sold and conveyed to one F. P. Burke a valuable piece of real estate, being lot No. 5 in square No. 256, in the city of Washington, for the sum of $6,000; $2,000 whereof was paid in cash, which went and was passed into the hands of the said Allison Nailor, jr.;” and that the rest of the purchase money was received by him during the years 1874 and 1875 ; so that he received all the rents, besides $6,000, the proceeds of property sold.
It further alleges that at the time the jn’operty was being sold under execution, this money was still in the hands of the defendant, and that he was bound to apply it to the relief of the property and to the discharging of the debts due; that he had in his hands sufficient property derived from *107 these sources to enable him to do so. It speaks also of the disparity between the real value of the property and the prices paid at the sale. It also alleges that the sales were made under an express understanding between the father and son that the latter should buy the property in for the benefit of the former and hold it subject to his direction.
In the answer, the defendant denies that he collected all the rents, and says that all he did collect were fully accounted for and paid over to his father or applied to his use; and he makes the same averments with reference to the money received from the Burke sale, that it was all paid over to his father or paid out for his benefit under his direction; and he denies that at the time of the execution sales he had any money in hand by the use of which he could have liquidated these judgments or paid off the property debts.
He alleges that his father stated to him that he did not mean to take any trouble about the sales.; that he was perfectly willing that he should buy the property as well as anybody else.
At that time, we are satisfied, there was a certain confidential relation between the deceased and the defendant. The defendant undoubtedly had been in the habit of collecting rents for his father and applying them under his direction. He had also received the whole $2,000 and retained it in his hands or disbursed it for his father’s use; and $4,000 afterwards came to his hands during the years 1874 and 1875.
The relations between the deceased and the defendant were such as to impose upon the defendant the duty of looking after his father’s interests. And I may'further add, with reference to the marshal’s sales, that the whole matter was left to the son. But on what terms? He says that the father agreed that he should buy the property for himself if he wanted to; but on the other hand it is claimed that the understanding was that he should buy it in for his father. But in either event, it is very clear that the law prohibits the son from taking advantage of the confidence reposed in him in order to acquire any great advantage at the expense of his father.
*108 Suppose we look at these transactions a little in detail. Take the first one. A lot of ground and a house which has been estimated variously to be worth from $1,800 to $2,500 was put up and sold under execution to satisfy a debt of $221.
The son purchased it at the auction at the nominal price of $1,800, and received a deed reciting the payment of that consideration. On examination of the testimony, we find that the debt under this judgment was only $221, that he paid that $221 to the marshal and produced and gave to the marshal an order from his father to the marshal to account to him, the son, for the balance.
In other words, we find that he received a deed for this property, giving the value at $1,800, when he actually paid for it only $221. It is true that he afterwards paid other amounts in the way of taxes, amounting in all to $500, which would make the total consideration nearly $800, which was probably not more than one-third of the value of the property, certainly not more than one-half. The same considerations may be apjfiied with different force and effect to the other transactions, although the disparity was not so great between the price paid and the value of the lot in the other cases as in this; but still, in the aggregate, it was very great. The price paid on all these pieces of property did not amount to one-third, and perhaps not more than one-quarter of the value of the property; and yet he received deeds in fee simple from the marshal for all the property.
We presume that nobody would look at this transaction without suspecting that there is something wrong about it. It appears to be either an abuse of the confidence reposed in him by the father, or it conveys the impression, very difficult to resist, that the property was bought in with the understanding, somehow or other, that it was to be conveyed to the father, or was to be held to benefit him, as he himself afterwards claimed.
The impression left upon everybody, by this simple statement of facts, would be that there must be a trust — an agreed trust between the parties, or that the law must imply one, *109 and that he ought to be charged, as trustee, with the property acquired in this way, of course being entitled to credit for all his disbursements on account of the property. That is the view we take of this part of the case; that the property shall be deemed to be the property of the deceased, held in trust by the defendant and subject to be accounted for.
With reference to that, I will make a further remark. The bill alleges that he received this large sum of money from the rents and proceeds of sale — over $6,000 from the proceeds of the sale alone. He alleges, in the most general terms, in his answer, that he applied that money to the use of this property. But this would be a very loose way of accounting. The case would seem to be this: He has not taken the witness stand and has not given any evidence oU the subject. The only evidence he relies on is such as his general answer furnishes, and that is very unsatisfactory evidence. It is a mere general, sweeping way of accounting for that large sum of money which must have been disbursed in detail. But whether that was properly disbursed or not, we hold is still an open question. We do not feel that we are precluded by this answer from going into the question ; and in the accounting, that matter must be fully investigated.
I might further state, in reference to this property, that the testimony of one of the complainants and one of the defendants, Washington Nailor and Trimble, I believe, was to the effect that the defendant acknowledged to them that the property was acquired for the benefit of the estate. I am not sure that the admission would not extend to all the property; at all events it would to this, and that evidence is wholly uncontradicted. The defendant did not take the stand, was not examined, and therefore the evidence is uncontradicted. Of course it is for the court to consider how far that evidence is open to suspicion on the ground of the interest of the parties, but still it is not formally impeached, and the court cannot disregard it. It only verifies the conclusion which we draw from the admitted facts of the case, that this is properly trust property.
*110 There is only one other piece 'of property referred to in the bill, and that is a lot of ground sold in 1866, and for which the defendant gave to his father fifty notes of $50 each. That was sub-lot B, square 227. It was alleged, as to this, in the bill, that on the 10th of October, 1872, there remained thirty-two of these notes unpaid, amounting to $1,950, and that the defendant had procured from his father, fraudulently, a receipt for this amount. All that he denies. But the bill does not seek to impeach that sale by the father to the son, and we have nothing to do with that at all. The result of that simply was a money indebtedness by the son to the father. ' If it has not been discharged, it is the right and duty of the administrator to sue on those notes which are still in the possession of the widow. But it does not enter into this case, and so we do not need to concern ourselves about it.
The result of the whole is, that the property conveyed in 1872 and 1873, and the property on E street, belongs to the defendant; and the question for him to determine is, whether to bring that into the division of the estate or to retain it. If he retains that, he gets nothing more. As to the other property bought at the marshal’s sale, that is to be deemed trust property and subject to partition.